UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

WILLIAM ROY LEE,

        Petitioner,

v.

RANDEE REWERTS,

        Respondent.

Case No. 1:18-cv-602

Honorable Paul L. Maloney

_____/

## **OPINION**

        This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, Rules Governing § 2254 Cases; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

## Discussion

### I. Procedural History

Petitioner William Roy Lee presently is incarcerated with the Michigan Department of Corrections at the Carson City Correctional Facility (DRF) in Carson City, Montcalm County, Michigan. Following a 15-day jury trial in the Wayne County Circuit Court, Petitioner was convicted of first-degree murder, Mich. Comp. Laws § 750.316a. On February 6, 2015, the court sentenced Petitioner to life imprisonment without parole.

Petitioner appealed his conviction to the Michigan Court of Appeals, raising a single issue:

> [PETITIONER] IS ENTITLED TO A NEW TRIAL WHERE THE TRIAL COURT ERRED IN THE ADMISSION OF THE ALLEGED STATEMENT BY A NON-TESTIFYING DEFENDANT.

(Pet., ECF No. 1, PageID.3.) His two co-defendants also appealed their convictions and the court of appeals consolidated the cases into a single appeal. In a lengthy, unpublished opinion issued on August 9, 2016, the court of appeals denied Petitioner's appeal and affirmed his conviction. *See People v. Thompkins et al.*, Nos. 326028, 326094, 326095, 2016 WL 4212142 (Mich. Ct. App. Aug. 9, 2016). Petitioner sought leave to appeal to the Michigan Supreme Court, raising the same ground. The supreme court denied leave to appeal on March 7, 2017.

On June 11, 2018, Petitioner filed his habeas corpus petition. Under Sixth Circuit precedent, the application is deemed filed when handed to prison authorities for mailing to the federal court. *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002). Petitioner placed his petition in the prison mailing system on June 25, 2018. (Pet., ECF No. 1, PageID.15.) The petition raises the single ground presented to the state appellate courts. (Pet., ECF No. 1, PageID.7.)

## II. Factual Background

Petitioner's conviction arises out of a shooting death that occurred in Detroit on July 31, 2013. Petitioner makes no challenge to the underlying facts as recited by the Michigan Court of Appeals. As a consequence, this Court relies on the factual summary of the Michigan Court of Appeals.

> The twenty-five year old victim in this case, Jonathon Michael Stokes (a/k/a "Slim"), was found shot to death near a bus stop in the City of Detroit on July 31, 2013. The victim's identification was found next to his body. His front pockets were turned inside out as though someone had rummaged through his pockets and his Cartier glasses were nowhere to be found. The victim had been shot five times – four times in the legs and once in his head; all shots were from behind. The four bullets recovered from the victim's body revealed that all bullets came from the same barrel of a .38 caliber weapon.
>
> Defendants were charged in the victim's murder and were tried together. Deseanta and Leander are cousins. Deseanta was also known as "D," "De" or "Day." Leander was sometimes referred to as "Le Le." Although tried together, there were two juries – one for Leander and another for Deseanta and Lee. At trial, it was the prosecutor's theory that defendants were upset with the victim and thought he was a "snitch." In contrast, defendants argued that this was a case of mistaken identity and that the shooter was actually Leander's cousin, Dejuan Griffin (Griffin), whose street name was similar to Deseanta's – "Da Da."
>
> Jeffrey Pursey testified that on the night of the murder he was on his way to a liquor store on Seven Mile between Grand River and Telegraph to meet a friend and go to the casino. Pursey was unable to pull into the driveway of the liquor store because there were three individuals in the way. One individual had on dark pants and a black hoody. Another had on dark pants and a white shirt. Pursey was not entirely sure what the third individual was wearing, but knew he was wearing dark clothing. At trial, Pursey identified Lee as the one in the white t-shirt and Deseanta as the one in the hoody. Pursey testified that Lee actually waved Pursey into the parking lot. Pursey's friend arrived within a couple of minutes. Pursey put his phone and charger on his friend's front seat and was planning to go into the liquor store to grab a drink when he heard five gunshots.
>
> Pursey went up to Seven Mile and saw the same three individuals running toward him. Pursey grabbed his phone from his friend's car and dialed 911 while driving to the area. He saw a body lying on the ground. Pursey called 911 and later gave Detective Detrick Mott a written statement and identified Lee from a photo array as the individual who waved him into the parking lot and the one he later saw running towards him. Pursey identified Deseanta from another array as the individual in the black hoody.

3

All three defendants attacked the credibility of Pursey's testimony because the victim's family had given Pursey $12,000 before trial as a reward for his cooperation. The victim's mother, Dorothy Strong-Stokes, testified that she and her husband had originally put up a $27,500 reward with Crime Stoppers, hoping to apprehend their son's killers. Although Pursey provided critical information in the case and had testified at several preliminary examinations, Crime Stoppers informed Strong-Stokes that Pursey did not qualify to receive the reward because he had not made a tip directly to them. Crime Stoppers told Strong-Stokes that if she wanted Pursey to have the money, she would have to do it herself. They returned the Stokes' money. Strong-Stokes testified that she felt $12,000 was a fair reward. She did not intend the payment as a bribe for Pursey's testimony. Pursey denied that the $12,000 influenced his testimony at a later preliminary examination or at trial. In fact, when Pursey gave his statement to police and positively identified Lee and Deseanta, he was unaware that there was a reward through Crime Stoppers.

The only witness at the bus stop the night of the murder was Castro Pettway. Pettway saw three individuals approaching from the east. One had on a black hoody and another was wearing a white t-shirt. They stopped about 40 feet before the bus stop and were talking amongst themselves. They continued to approach the bus stop when the individual wearing the hoody mentioned something to the victim about a bus and pulled out a gun. Pettway heard and saw the first shot fired and then ran. He heard three or four more shots. Pettway waited approximately five minutes and then went back to retrieve his bag. Pettway could not identify the shooters at trial.

Walter Williams was doing some maintenance in the area where the murder occurred. He heard four gunshots in the distance. From a window, Williams could see that there was a man on the ground and four others around him. Three of the men were kneeling down and appeared to be going through the man's pockets. Like Pettway, Williams could not identify any of the individuals at trial.

Another key witness for the prosecution was Diamond Ruff (Ruff), who testified that she was with all three defendants the night of the shooting. Ruff testified that she had known the victim for seven years and he was once her best friend. She knew Lee as "Will," Deseanta as "De" (the letter), and Leander as "Lee" or "Lee Lee." Ruff testified that both the victim and defendants sold marijuana.

On the day of the murder, Ruff had been drinking Cognac since the morning. She also had been smoking "kush," which she described as a more "exotic" and "stronger" form of weed. Ruff was riding around with defendants in Lee's Yukon or Suburban. She probably "dozed off" in the car from smoking and drinking. At approximately 10:00 p.m., Deseanta went to the store to buy more liquor and blunts. Lee received a phone call and told the caller, "be there in a minute." All three defendants then got out of the car. Defendants returned after approximately 10 minutes. They seemed "hyped up" so Ruff asked them what was

4

happening. Leander said, "I got that n*****, I got that n*****." In her statement to police, Ruff said that Defendant Leander Thompkins said, "I got that n*****, I got that n***** . . . I had to pop a n***** a couple of times. That n***** got handled."

Ruff did not know what Leander was talking about. Defendants dropped her off at a friend's house. While at her friend's house, Ruff received a call that the victim was dead. Ruff put together a candlelight vigil, which defendants attended. Although Ruff could have contacted the victim's parents with information about the murder, she was scared to do so. Ruff eventually gave Mott a statement and identified defendants from photo arrays.

As part of his investigation, Mott went to the liquor store to see if there was useable surveillance footage. Because the footage ran a ten hour loop, Mott had to capture the video on his phone's camera. Therefore, as the parties acknowledged, the footage was not good. The jury watched the surveillance video from inside and outside the store.

Mott testified that Lee gave police a statement on November 22, 2013. The video was played for the Deseanta/Lee jury, only. In the statement, Lee told Mott that Leander was there at the time of the shooting, but blamed the shooting on "Day" or "Day Day" (Griffin), who shot the victim because "he was snitching or being an informant in the neighborhood." Mott testified that Leander also made an informal statement to police on November 22, 2013 at which time Leander indicated he was with his cousin at the time of the shooting. Mott spoke with Leander a second time on November 25, 2013. Leander denied that he was present during the murder, but implicated his cousin, Griffin, saying "that's the kind of person he is." Leander demonstrated for Mott how Griffin shot the victim.

Griffin had asked Dwayne Haywood[2] to borrow a weapon, but Leander did not think Griffin was going to kill the victim. Leander vehemently denied being part of the crime. He was released from custody shortly after making his statement, but was later re-arrested after Mott had a chance to interview Ruff and learned that Leander admitted to shooting the victim.

In front of the Deseanta/Lee jury, only, Hasheem Beamon testified that, on the night of the murder, he was with defendants, as well as Haywood, "Da Da" (Griffin) and "50." At some point, Leander, "Da Da" and "50" left; neither Lee nor Deseanta went with them. Shortly after they left, Beamon heard gunshots. The men returned and Leander said that they shot someone named "Slim." Leander said he shot first and then "Da Da" took the gun and "finished him off." They told Beamon that "Slim" was a snitch: "They told me they had to kill a n*****." Beamon gave Mott a statement on February 19, 2014, identifying both Leander and Deseanta, but adding that Deseanta and Lee "didn't have s*** to do with this."[3]

Brandy Harris testified that the victim was her cousin. She was planning to pick him up the night of the murder. In a phone call earlier that day, the victim

5

reported that he had just had a fight with someone who had called him a snitch. Harris remembered that one of the houses that the victim frequented had been raided. Later, Harris saw that a Caucasian man had the victim's phone and when Harris asked the man where the victim was, he told her that the victim had gone to the gas station. After learning that the victim had been shot, Harris went to retrieve the victim's phone from the Caucasian man, who threw it at her. Mott acknowledged that a white man on Wormer, Patrick Boggs, was later arrested on unrelated charges. Mott did not believe Boggs was connected to the homicide.

In front of the Deseanta/Lee jury, only, Shenequia Carr (Peaches) testified that she was with Deseanta at her house at the time of the murder. They heard shots and police sirens and walked to where the shooting occurred. In a surveillance photo, Carr identified the man in a hoody as "Da Da," whom she also saw that night. Carr testified she saw Lee with Haywood a couple of doors down. She did not see Ruff with any of the defendants.

Although Leander, Haywood's widow (Roslyn Haywood), Beamon, and Carr, accused "Da Da" (Griffin) of being responsible for the crime, attempts at locating him were unsuccessful. Mott admitted that he initially associated "Da Da" with Deseanta.

[2] Haywood was deceased at the time of trial.

[3] Beamon later shot and killed Haywood in what was described as an accidental shooting.

*Thompkins*, 2016 WL 4212142, at **1-4.

### III. **AEDPA standard**

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented

in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams*, 529 U.S. at 381-382; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in

7

their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

### IV.     Error in Admission of Statement by Non-Testifying Co-Defendant

Petitioner contends, as he did in the Michigan appellate courts, that the trial court erred in admitting Leander's statement to Ruff about what had occurred. He argues that the evidence was inadmissible hearsay under the Michigan Rules of Evidence and that the evidence violated Petitioner's rights under the Confrontation Clause.

The Michigan Court of Appeals rejected Petitioner's claim, as follows:

> Lee argues that the trial court erred in concluding that Leander's statement to Ruff was admissible as an excited utterance under MRE 803(2) or as a statement against penal interest under MRE 804(b)(3). We disagree.
>
> MRE 803(2) provides that, regardless of whether a declarant is available, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. "The rule allows hearsay testimony that would otherwise be excluded because it is perceived that a person who is still under the sway of excitement precipitated by an external startling event will not have the reflective capacity essential for fabrication so that any utterance will be spontaneous and trustworthy." *People v. Smith,* 456 Mich. 543, 550; 581 NW2d 654 (1998) (internal quotation marks omitted). Therefore, when determining whether the declarant is still under the excitement caused by the event, the relevant inquiry is "whether the

8

statement was made before there was time to contrive and misrepresent, and whether it related to the circumstances of the startling occasion." *Id.* at 550–551, citing *People v. Straight*, 430 Mich. 418, 424, 424 NW2d 257 (1988). However, "it is the lack of capacity to fabricate, not the lack of time to fabricate, that is the focus of the excited utterance rule. The question is not strictly one of time, but of the possibility for conscious reflection." *Smith,* 456 Mich. at 551. The key is whether the declarant "was still under the influence of an overwhelming emotional condition" at the time the statement was made. *Straight,* 430 Mich. at 425.

The record reveals that Leander was still under the stress of the excitement when he made the statement to Ruff. Ruff testified that the defendants left after Lee received a telephone call and returned after approximately 10 minutes. She noticed that defendants seemed "hyped up" so Ruff asked them what was happening. Leander said, "I got that n*****, I got that n*****." In her statement to police, Ruff said that Defendant Leander Thompkins said, "I got that n*****, I got that n***** . . . I had to pop a n***** a couple of times. That n***** got handled." Not only was the statement contemporaneous with the shooting, but Leander was acting under the influence of the stress of the event, as demonstrated by Ruff's testimony that they all seemed "hyped up." The trial court did not abuse its discretion when it admitted the statement as an excited utterance.

In contrast to an excited utterance where the availability of the declarant is irrelevant, a statement against penal interest is only admissible if the declarant is unavailable.[8] MRE 804(b)(3) provides:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

A reasonable person in Leander's position would not have admitted to having "to pop a n***** a couple of times" because such a statement exposed Leander to criminal liability. Because Leander's statement was not "offered to exculpate the accused"

> there is no need to determine whether "corroborating circumstances clearly indicate the trustworthiness of the statement" under the rule.
>
> To the extent Lee argues that the statement violated his right to confrontation, the Michigan Supreme Court has determined that "the holding in *Poole,* that a codefendant's nontestimonial statement is governed by *both* MRE 804(b)(3) and the Confrontation Clause is no longer good law." *People v. Taylor,* 482 Mich. 368, 378; 759 NW2d 361 (2008). Once a determination is made that a declarant's statement is nontestimonial, i.e. "made informally to an acquaintance, not during a police interrogation or other formal proceeding . . . or under circumstances indicating that their 'primary purpose' was to 'establish or prove past events potentially relevant to later criminal prosecution,' " the admissibility of the statement is ruled solely by MRE 804(b)(3). *Taylor,* 482 Mich. at 378. Leander's statement not being testimonial in nature, the right to confrontation was not violated and the trial court did not abuse its discretion in admitting Leander's statement as a statement against penal interest.

*Thompkins*, 2016 WL 4212142, at *9-10.

To the extent that Petitioner argues that the evidence should not have been admitted under the Michigan hearsay rules, his claim is not cognizable on habeas review. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the

state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000). Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard. The Supreme Court has never recognized that the constitution is violated by the admission of unreliable hearsay evidence. *Desai v. Booker*, 732 F.3d 628, 630-31 (6th Cir. 2013). Instead, the Supreme Court has "h[e]ld out the possibility that 'the introduction' of 'evidence' in general could be 'so extremely unfair that its admission violates fundamental conceptions of justice.'" *Id.* at 631 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). Such a standard is highly general. "'The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations,'—and, it follows, the less likely a state court's application of the rule will be unreasonable." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In the instant case, the court of appeals held that the admission of Leander's statement fell within two established hearsay exceptions – the excited utterance exception under MRE 803(2) and the exception for statements against penal interest under MRE 804(b)(3). "Where, as here, a state court reasonably rejects a rule urged by the claimant but yet to be adopted by the Supreme Court, it does not unreasonably apply established federal law." *Desai*, 732 F.3d at 632 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).

Petitioner next argues that the admission of Leander's statement to Ruff violated Petitioner's right under the Confrontation Clause. The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. Const., Am. VI; *Pointer v. Texas*, 380 U.S. 400, 403-05 (1965) (applying the guarantee to the states through the Fourteenth Amendment). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause therefore prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

Not every out-of-court statement introduced at trial will implicate the protections of the Confrontation Clause.

> The text of the Confrontation Clause ... applies to "witnesses" against the accused— in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

*Crawford,* 541 U.S. at 51. The *Crawford* Court had no need to decide whether the Confrontation Clause had any application to nontestimonial statements, though the Court suggested in dicta that the Clause did not apply to nontestimonial statements. In *Davis v. Washington*, 547 U.S, 813 (2006), the Supreme Court considered the question left open in *Crawford*, explicitly deciding that the Confrontation Clause applied only to testimonial hearsay. *Id.* at 823-24. *See also Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("Under [*Ohio v.*] *Roberts*, [448 U.S. 56 (1980),] an out-of-

court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability. Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."); *Giles v. California*, 554 U.S. 353, 376 (2008) (reiterating that "only *testimonial* statements are excluded by the Confrontation Clause. Statements to friends and neighbors . . . and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules.") (emphasis in original).

In the instant case, the Michigan Court of Appeals concluded that Leander's statement to Ruff was nontestimonial. That conclusion was entirely reasonable. Leander made the statement to Ruff, who was a friend or acquaintance who was riding in the car when Petitioner received a call, remained in the car during the ten minutes the three defendants were gone, and was present when they returned. No circumstances existed that would suggest that the statement constituted "testimony" as defined by *Crawford*. *See United States v. Franklin*, 415 F.3d 537, 545-46 (6th Cir. 2005) (hearsay admissions of a codefendant to a friend and confidant are not testimonial) (citing, *inter alia*, *United States v. Manfre*, 368 F.3d 832, 838 n.1 (8th Cir. 2004) (statements "made to loved ones or acquaintances . . . are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks.")). The determination of the Michigan Court of Appeals therefore was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

## **Conclusion**

In light of the foregoing, the Court will summarily dismiss Petitioner's application pursuant to Rule 4 because it fails to raise a meritorious federal claim.

**Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court's dismissal of Petitioner's action under Rule 4 of the Rules Governing § 2254 Cases is a determination that the habeas action, on its face, lacks sufficient merit to warrant service. It would be highly unlikely for this Court to grant a certificate, thus indicating to the Sixth Circuit Court of Appeals that an issue merits review, when the Court has already determined that the action is so lacking in merit that service is not warranted. *See Love v. Butler*, 952 F.2d 10 (1st Cir. 1991) (it is "somewhat anomalous" for the court to summarily dismiss under Rule 4 and grant a certificate); *Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir. 1990) (requiring reversal where court summarily dismissed under Rule 4 but granted certificate); *Dory v. Comm'r of Corr. of New York*, 865 F.2d 44, 46 (2d Cir. 1989) (it was "intrinsically contradictory" to grant a certificate when habeas action does not warrant service under Rule 4); *Williams v. Kullman*, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983) (issuing certificate would be inconsistent with a summary dismissal).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."

*Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

The Court will enter a Judgment and Order consistent with this Opinion.

Dated: June 20, 2018        /s/ Paul L. Maloney
                            Paul L. Maloney
                            United States District Judge